# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| CATILINA NOMINEES PROPRIETARY LTD., et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 15-cv-10734 |
| v. | ) ) | Judge Andrea R. Wood |
| STERICYCLE, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Catilina Nominees Proprietary Ltd. ("Catilina") and Daniels Sharpsmart, Inc. ("Sharpsmart") have sued Defendant Stericycle, Inc. ("Stericycle") alleging infringement of U.S. Patent No. 6,250,465 ("'465 patent"). The allegedly infringing activities concern a Stericycle container for the disposal of medical sharps and waste. Stericycle, in turn, has brought counterclaims seeking a declaratory judgment that the '465 patent is invalid and not infringed by Stericycle. The parties now ask this Court to construe several disputed terms of the '465 patent, which appear in claims 21–24.

## BACKGROUND

Catilina owns the '465 patent at issue in this case. (Compl. ¶ 24, Dkt. No. 1.) Sharpsmart has the exclusive license and right to practice the '465 patent within the United States. (*Id.* ¶ 25.) The patent-in-suit is titled "Sharps Container" and discloses a container for receiving and storing medical sharps and waste materials. (Joint Appendix ("JA") at 1 abstract, Dkt. No. 28-1.) The container is designed to prevent hand access to the medical waste stored within the container, which might include needles, syringes, and surgical blades. (*Id.* at 8 1:4–6.) In this way, the container not only reduces the risk of used syringes being stolen but also reduces the risk of

needle-stick injuries and transmission of infectious disease to medical staff and patients. (*Id.* at 8 1:19–28.) A preferred embodiment of the container, as depicted in FIG. 1 from the '465 patent, is shown below. (*Id.* at 2.) It consists of a receptacle for receiving and storing medical waste, a tray upon which medical waste may be placed and that can pivot to deposit the waste into the receptacle, and a lid. (*See, e.g.*, *id.* at 1 abstract.)



FIG 1

The parties ask this Court to construe the following terms of the patent-in-suit: "hinged" and "hingedly connected;" "prevent hand access" and "impede hand access;" "to extend outwardly from the opening;" "operative condition" and "inoperative condition;" "movable lid" and "a lid . . . movable;" and the preambles of claims 21–24. (Ex. A to Joint Claim Construction Chart, Dkt. No. 32-1.)

## DISCUSSION

Claim construction is a question of law to be decided by a judge. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 391 (1996). Claim terms are generally given their

ordinary and customary meaning, which is the meaning the terms would have to a person of ordinary skill in the art at the time of the invention "in the context of the entire patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). District courts are not required to construe every limitation in the asserted claims—rather, the purpose of claim construction is to resolve disputed meanings and technical scope, and to clarify and, when necessary, explain what claims cover. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). In construing claims, a court may adopt a definition not proposed by either party, as the court's role is not to decide which of the parties' constructions is correct but rather to assess independently the meaning of the claims. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1376 (Fed. Cir. 2017).

In certain cases, the ordinary meaning of terms as understood by a person of skill in the art may be readily apparent even to a lay person, and "claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. But courts must also be mindful of the purpose of claim construction, which is to determine the meaning and scope of the asserted claims. *O2 Micro Int'l Ltd.*, 521 F.3d at 1360. Hence, "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *Id.* Therefore, "a determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361; *see also Clare v. Chrysler Grp. LLC*, 819 F.3d 1323, 1329 (Fed. Cir. 2016). When construing the term as having "plain and ordinary meaning" resolves the parties' dispute, a court may do so. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *see also Finjan, Inc. v. Secure*

*Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010). In many cases, however, determining the ordinary and customary meaning of the terms requires examination of their particular meaning in a field of art. *Phillips,* 415 F.3d at 1314. Because such meaning is often not immediately apparent and patentees may use terms idiosyncratically, courts look to intrinsic and extrinsic evidence to construe the terms. *Id.*

Claim analysis begins with the intrinsic evidence, including the claims themselves, the patent specification, and the prosecution history. *Phillips*, 415 F.3d at 1316–18. The language of the claims provides substantial guidance regarding the meaning of particular terms—the context in which the terms appear in the asserted claims is "highly instructive" and other claims of the patent in question are also "valuable sources of enlightenment as to the meaning of a claim term." *Id.* at 1314. But patent claims do not stand alone. *Id.* "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Therefore, the specification is "the single best guide to the meaning of a disputed term," and it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317, 1321. At the same time, while courts should "read claims in view of the specification, of which they are a part, [courts] do not read limitations from the embodiments in the specification into the claims." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). The prosecution history can also be informative regarding the meaning of the terms. *Phillips,* 415 F.3d at 1317 (Fed. Cir. 2005). For example, it might illuminate the meaning of the terms by demonstrating how the inventor understood the invention, but it might also exclude certain interpretations if the inventor limited the invention in the course of prosecution. *Id.*

Extrinsic evidence, such as dictionary definitions and expert testimony, also may be used to facilitate claim construction. *Id.* However, extrinsic evidence is less significant and less reliable than the intrinsic record in construing disputed terms. *Id.* at 1317–18; *see also SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013).

Departure from the plain and ordinary meaning is warranted only when a patentee acts as his own lexicographer or when the patentee disavows the full scope of the claim term in the specification or during prosecution. *Hill–Rom Servs., Inc.*, 755 F.3d at 1371. The standard for finding lexicography is exacting. *Id.* To act as a lexicographer, a patentee must clearly set forth a definition of a term other than its plain and ordinary meaning and must clearly express an intent to redefine the term. *Id.* Thus, even when the specification describes only a single embodiment, the claims of the patent should not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." *Id* at 1372. Disavowal may be effectuated by language in the specification or the prosecution history. *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). The standard for disavowal is also "exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Id.* "Ambiguous language cannot support disavowal." *Id.* But while disavowal must be clear and unequivocal, it need not be explicit. *Id.* Thus, an inventor may "disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." *Id*.

I.     **"Hinged" and "Hingedly Connected"**

The parties dispute the meaning of the terms "hinged" in claims 21 and 22 of the '465 patent and "hingedly connected" in claims 23 and 24. The parties agree that these terms are used interchangeably. However, Plaintiffs argue that the terms should be construed as "the lid is

capable of pivoting about a connection between the lid and the receptacle, allowing the lid to move to a closed position wherein it closes the opening of the receptacle," while Stericycle argues that the proper construction of the terms is "the lid and the receptacle are connected along only one of their respective sides to at least one 'hinge,' a structure that allows the lid to rotate around an axis positioned parallel to that connected side." (Ex. A to Joint Claim Construction Chart at 4.) Thus, the parties dispute whether the hinged connection must be located along only one side of the lid and receptacle and whether the connection allows for only a specific type of movement.

The Court agrees with the parties that the terms "hinged" and "hingedly connected" are used interchangeably in the '465 patent and should be given the same meaning. For example, claim 1 states that a container comprises "a lid for closing the opening, the lid being ***hinged*** to the receptacle." (JA at 14 14:18–20 (emphasis added).) Claim 12, which indirectly depends upon claim 1, has the following language: "the ***hinged connection*** of the lid to the receptacle." (*Id.* at 15 15:26–27 (emphasis added).) There is no indication in other intrinsic evidence that the terms should be given different construction.

Turning to the meaning of the terms, claim 21 recites a container comprising "a movable lid for completely closing the opening, the lid being ***hinged*** to the receptacle for movement between opened and closed positions." (JA at 15 16:1–3 (emphasis added).) The container of claim 21 also consists of "a pivotal tray . . . ***mounted*** to be accessible for medical sharps and waste materials . . . [,]the tray being ***pivotally movable*** with respect to the opening of the receptacle for disposal of medical sharps and waste materials therefrom into the receptacle, . . . the tray being arranged . . . to prevent had access into the receptacle for all positions of the tray about its ***pivotal axis***." (*Id.* at 15 16:4–15 (emphasis added).) Claim 23 recites a container consisting of "a lid for closing the opening ***hingedly connected*** to the receptacle and manually

6

movable between opened and closed positions." (*Id.* at 15 16:24–26 (emphasis added).) The container of claim 23 also consists of "a disposing tray . . . ***pivotally mounted*** at the receptacle opening" and "***pivotally movable*** such that the medical sharps and waste are disposable therefrom into the receptacle." (*Id.* at 15 16:27–39 (emphasis added).)

Stericycle argues that the language of these claims distinguishes structures that are "***hingedly connected***" (such as the lid) from those that are "***pivotally mounted***" (such as the tray); thus, "hinge" and "pivot" must be two markedly distinct structures. *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) ("the use of both terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each"). While the Court agrees that the claims use different terms, this does not necessarily mean that the differing terms are mutually exclusive—for example, the terms "hinged" and "hingedly connected" might be broader or have an overlapping scope with the term "pivotally mounted."

The specification of the patent-in-suit is highly instructive regarding the scope of the terms. For example, the disclosure of the invention section of the specification describes an embodiment in which "the container includes a structure on which the pivotal disposing means is pivotally mounted, and this structure in turn is ***removably mounted*** on the receptacle." (JA at 10 5:14–16 (emphasis added).) The specification further elaborates that "[p]referably[,] said structure is ***removably hinged*** to the receptacle opposite the ***hinged connection*** of the lid to the receptacle." (*Id.* at 10 5:24–26 (emphasis added).) Thus, it appears that the specification uses the terms "mounted" and "hinged" in at least an overlapping manner, if not a co-extensive one.

The disclosure of the invention section further states that the container's closure (such as a lid) can be "***pivotally hinged*** to a rear edge of the receptacle opposite its front edge." (*Id.* at 8 2:5–

6 (emphasis added).) It further provides that while in some embodiments "the lid is maintained in a generally stationary opened position throughout disposal of sharps material, an alternative arrangement is that ***the lid may be caused to pivot*** with the tray in order to reduce the gap between the lid and the tray." (*Id.* at 8 2:62–66 (emphasis added).) The detailed description of the preferred embodiment section of the specification describes a container having "a closure in the form of a lid [,] which is ***hingely connected*** along a rear edge portion of the rim." (*Id.* at 11 7:48–49 (emphasis added).) The detailed description further states that Figure 2 depicts the hinged connection of the preferred embodiment. (*Id.* at 11 7:50.) The detailed description goes on to elaborate that "[t]he lid []can be moved from the opened position . . . to a closed position simply by pressing downwardly on the lid," which "allows the lid [] to ***pivot*** about its ***hinged connection***." (*Id.* at 12 9:1–6 (emphasis added).) A preferred embodiment further "includes a pivoting structure  . . . which is ***pivotally connected*** to the top rim [] of the receptacle [] by a ***hinged connection*** [] opposite the hinged connection [] of lid." (*Id.* at 12 9:43–46.) In sum, the specification indicates not only that a "pivotal connection" can be accomplished via a "hinged connection," but also that a "hinged connection" (including the connection of a lid to a receptacle) allows for a pivoting movement.[1] It also appears that the specification does not differentiate between the terms "hinged" and "hingely connected."

---

[1] Interestingly, claim 26 recites "a lid for closing the opening ***hingely connected*** to the receptacle," "a disposing tray ***mounted*** at the opening [of the receptacle] . . . , the disposing tray being ***pivotally movable*** independently of the closure for disposal of the medical sharps and waste materials therefrom into the receptacle," and "a structure ***hingely connected*** to the receptacle and on which the disposing tray is pivotally mounted to be disposed at the receptacle opening, the structure being movable relative to the receptacle to move the disposing tray away from the receptacle opening to facilitate emptying of the container." (JA at 15 16:57–67, 16 17:1–10 (emphasis added).) Claim 27, which depends on claim 26, states that "the lid and ***the disposing tray*** are ***hingely connected*** to the receptacle along opposite edges of said receptacle opening." (*Id.* at 16 17:11–13 (emphasis added).) Thus, it appears that the '465 patent contemplates that a "pivotally movable" disposing tray can be "hingely connected" to the receptacle.

The specification further specifies what the "pivoting" movement may encompass, describing a preferred embodiment in which the lid pivots along the axis that is parallel to the side of the receptacle to which the lid is hinged. (*Id.* at 2 fig. 1, 3 fig 2, 12 9:1–15.) The specification further contemplates that a pivoting movement may also include a movement that different parts comprising a tray make around the axis formed by a pin extending from one part of the tray into an opening formed in the other of those parts, on opposite sides of the tray; or the movement that a tray makes about the axis that is formed by the "pivotal mount[ings]" on the opposite sides of the tray. (*Id.* at 11 7:3–13.) In essence, the '465 patent indicates that the "pivoting" movement is a broad concept that encompasses a rotation around the axis that may or may not be parallel to the sides connecting a pivoting object to the structure the object pivots about.

It therefore appears that the specification and the claims of the '465 patent all point to a broad construction of the terms "hinged" and "hingedly connected." Nonetheless, Stericycle insists on a much narrower construction—one in which the "hinge" mechanism connects the lid and the receptacle "along only one of their respective sides." Stericycle further wants to limit the scope of the terms to encompass the rotation of the lid only "around an axis positioned parallel" to the side that connects the lid and the receptacle. Such a construction is improper. First, it is clear from the language of the '465 patent that when the patentee wanted to indicate the connection along only one side, the patentee knew how to do it and did so. For example, the specification describes a preferred embodiment in which the container has a lid that "is hingedly connected ***along a*** rear ***edge*** portion of the rim." (*Id.* at 11 7:47–51 (emphasis added).) Likewise, claim 27 specifies "the lid and the disposing tray are hingedly connected to the receptacle ***along*** opposite ***edges*** of said receptacle opening."(*Id.* at 16 17:11–13 (emphasis added).) Second, Stericycle's reliance on Figure 2 and other descriptions of the preferred embodiment to limit the terms' scope

is improper. The Federal Circuit has repeatedly warned courts against reading the limitations of the preferred embodiments into the claim language. *See, e.g., Hill-Rom Servs., Inc.*, 755 F.3d at 1371. It is true that while "[c]laims are not necessarily limited to preferred embodiments, but, if there are no other embodiments, and no other disclosure, then they may be so limited." *Lizardtech, Inc. v. Earth Res. Mapping, Inc.*, 433 F.3d 1373, 1375 (Fed. Cir. 2006). Nonetheless, as explained above, the specification and claims suggest that a "hinged" connection allows for a pivoting movement. And the specification further provides that "pivoting" encompasses a broad range of movements, not limited to the movement suggested by Stericycle. Thus, limiting the claim scope to the preferred embodiment would be improper here.

Therefore, this Court construes the terms "hinged" and "hingedly connected" as "connected by a mechanism that allows for a pivoting movement." To avoid any confusion, the Court emphasizes that, as discussed above, a pivoting movement is not limited to movement around the axis parallel to the side connecting the lid and the receptacle.

## II.     "Prevent Hand Access" and "Impede Hand Access"

The parties also ask this Court to construe the term "prevent hand access," found in claims 21 and 22 of the patent-in-suit, and the term "impede hand access," found in claims 23 and 24. Plaintiffs argue that the terms mean "hand access is sufficiently restricted to prevent or impede placement of a hand into the receptacle." Stericycle, on the other hand, insists that the proper construction for the term "prevent hand access" is "the tray, by itself and in all positions of movement, does not allow any part of a person's hand to reach or protrude into the portion of the receptacle that holds disposed medical sharps and waste materials," while the term "impede hand access" means "when the tray moves toward the lid, the tray alone blocks the ability of any part of a person's hand to reach or protrude into the portion of the receptacle that holds disposed medical

sharps and waste materials." In essence, the parties agree that the terms are used interchangeably[2] but dispute whether the tray by itself prevents the hand from accessing the receptacle and the degree to which the access is prevented.

Although both terms appear in the claims of the '465 patent, the claims do not provide any guidance on how the terms differ, if they differ at all. The specification suggests that the terms "prevent" and "impede" are interchangeable, at least in the context of restricting hand access:

> [T]he tray, or a portion thereof, pivots in a direction towards the lid and the reduction in the gap therebetween is sufficient to prevent a user placing his/her hand therethrough to obtain access to within the receptacle. Preferably, the gap continues to be reduced as the tray pivots towards the lid and preferably the gap is substantially eliminated, or at least minimized at the point of disposal of the sharps object from the tray into the receptacle to **_prevent or effectively impede_** the fingers of a person disposing the sharps material from extending through the gap.

(JA at 8 2:29–38 (emphasis added).) Nothing in the specification or claims of the '465 patent suggests that the terms have a different meaning. Thus, the Court agrees with the parties that the terms "prevent hand access into the receptacle" and "impede hand access into the receptacle" have the same meaning.

The background section of the specification describes why prevention of hand access is an important feature of a container for storage of medical sharps—it guards against "pilfering of used syringes and the like to prevent them falling into the hands of intravenous drug users or others who are likely to use them without proper sterilization" and allows for "safe[] stor[ge] [of the sharps] without placing hospital staff and patients at risk of contact with the sharps, which otherwise could result in needle stick injuries and the potential for transfer of infectious disease." (_Id._ at 8 1:20–28.) The disclosure of the invention section of the specification describes various ways by which hand access to the receptacle is prevented and also specifies the following:

---

[2] Although Stericycle proposes slightly different construction for the two terms, it admits that there is no disagreement between the parties that the terms are used interchangeably. (_See_ Def.'s Reply at 6, Dkt. No. 30.)

> The prevention of hand access as described hereinabove is intended to mean that a person who is using the container to dispose of sharps material, as well as others who may come into contact with the container, cannot extend their hand(s), or portion of their hand(s), into a storage section of the receptacle. This renders the container as a particularly safe storage facility for sharps material substantially eliminating injury or infectious transmission by preventing human contact with that material.

(*Id.* at 10 5:56–64.) The rest of the specification as well as the claims support this definition. (*See, e.g., id.* at 8 2:29–46, 15 16:14–41.)

Still, Stericycle insists that the meaning of the terms "prevent hand access" and "impede hand access" must also incorporate the idea that the tray alone prevents hand access into the receptacle. In support, Stericycle points to claim 23, which specifies that "***the disposing tray impedes hand access*** into the receptacle" and that the "front portion of ***the tray*** moves toward the lid to continue ***to impede hand access*** into the receptacle," as well as claim 24, which provides that the "***tray***" moves from a "stored position" to a "block position . . . to thereby impede hand access into the receptacle." (*Id.* at 15 16:34–48 (emphasis added).) But claim 21 also states that the "tray being arranged ***relative to the lid*** in its opened position and arranged ***relative to the receptacle*** and its opening to prevent ***hand access*** into the receptacle for all positions of the tray about its pivotal axis." (*Id.* at 15 16:11–15 (emphasis added).) Thus, Stericycle's construction in which the tray "by itself" prevents the access to the receptacle would read out or make meaningless a portion of the claim's language describing the role of the tray positioning relative to the lid in preventing hand access. *See Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010) ("we construe claims with an eye toward giving effect to all of their terms").

Moreover, the '465 patent specification describes a preferred embodiment in which the position of the tray relative to the lid (as well as other components of the container) plays an important part in preventing hand access. (JA at 5 figs. 4 & 5, 12 10:30–53 (describing, among

other things, the importance of the size of the gap between the lid and the tray in preventing hand access).) Thus, Stericycle's construction would also exclude the preferred embodiment from the claims' scope. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (an interpretation under which "a preferred (and indeed only) embodiment in the specification would not fall within the scope of the patent claim . . . is rarely, if ever, correct and would require highly persuasive evidentiary support"). Therefore, the Court does not agree with Stericycle that hand access is prevented or impeded only by the tray itself.

The parties also dispute whether prevention or impediment of hand access means that no part of the hand (*e.g.*, even a fingernail) can access the receptacle. Stericycle insists that hand access is prevented completely, with no exception for fingernails or other hand parts. Stericycle argues that this understanding is consistent with the specification, including the definition of "prevention of hand access" provided in the specification and recited above, as well as the stated purpose and objective of the invention to prevent needle-stick injuries. Plaintiffs, however, assert that Stericycle's interpretation is too restrictive, as it has no support in the specification and reads out the preferred embodiment described in the '465 patent.

Despite the parties' disagreement on the issue, the '465 patent specification is clear on the extent to which hand access is prevented or impeded: a person "cannot extend their hand(s), or portion of their hand(s), into a storage section of the receptacle" so that an "injury or infectious transmission" is "substantially eliminate[ed] . . . by preventing human contact" with the medical waste. (JA at 10 5:56–64.) The specification does not say that hand access is "sufficiently restricted to prevent or impede placement of a hand into the receptacle," as Plaintiffs suggest. Nor does it say that "any part of a person's hand," such as a fingernail or hair, cannot reach or protrude into the receptacle, as Stericycle contends. Rather, the specification states that the hand's reach

into the receptacle is restricted to such extent that injury and infectious transmission is

"substantially eliminated . . . by preventing human contact"—which can occur when the hand or a

portion of it comes into contact with sharps and other waste stored in the receptacle. (*Id.*)

For these reasons, the Court construes the terms "prevent hand access into the receptacle"

and "impede hand access into the receptacle" to mean "make it so that a person who is using the

container, as well as others who may come into contact with the container, cannot extend their

hand(s), or portion of their hand(s), into the receptacle that holds medical sharps and waste,

thereby substantially eliminating injury or infectious transmission by preventing human contact

with medical sharps and waste."[3] This construction closely tracks the definition provided in the

'465 patent specification (and recited above), with a few modifications to make it consistent with

the language of the claim in which the terms are used.

### III.    "To Extend Outwardly from the Opening"

The parties also dispute the meaning of the term "to extend outwardly from the opening,"

which appears in claims 21 and 22. Plaintiffs argue that no construction is necessary as the phrase

has a plain and ordinary meaning; Stericycle contends that the Court should construe the phrase as

"the tray has a resting position that extends substantially beyond the front edge of the receptacle's

front wall."

---

[3] The Court notes that, as recited above, the specification indicates that hand access is prevented with respect to the "storage section of the receptacle" and then goes on to suggest that the storage section may not be the entire volume of the receptacle. However, claims 21–24 only recite that hand access is prevented or impeded "into the receptacle," not "into the storage potion of the receptacle." (*Id.* at 15 16:14, 41–43, 47.) The Court sees no need to identify in its construction whether the hand access must be prevented specifically with respect to the storage portion of the receptacle. The Court's construction makes clear that the prevention of access substantially eliminates injury or infectious transmission by preventing human contact with medical sharps and waste; such contact can only occur when the hand (or its portion) reaches the medical waste that is stored in the receptacle, in what the patent-in-suit calls the "storage section of the receptacle."

The '465 patent specification describes that "[a] subsidiary object [of the invention] is to provide a reusable sharps container construction which allows for embodiments of the container to have a large access opening." (JA at 8 1:44–46.) The specification goes on to say how such objective may be accomplished: "[a]t its rest position, a front edge of the tray may be located adjacent to a front edge of the opening of the receptacle, with the closure being pivotally hinged to a rear edge of the receptacle opposite its front edge." (*Id.* at 8 2:3–6.) Hence, "on pivoting of the tray, its front edge moves towards the opened closure, namely a lid, and its rear edge moves into the receptacle." (*Id.* at 8 2:6–9.) Such "arrangement facilitates the provision of a wide access opening for disposal of medical sharps and waste" because "the tray can provide a broad surface upon which the sharps and waste materials may be placed, which surface may be relatively widely spaced from the lid in its opened position, particularly a front edge thereof, depending upon the degree to which the lid is opened relative to the receptacle." (*Id.* at 8 2:9–13.)

The specification further explains how certain characteristics of the tray facilitate the goal of convenient disposal of sharps and other waste: "[p]referably the pivotal disposing means, whether or not in the form of a tray, ***extends outwardly*** of the container when at its rest position, to facilitate placement of sharps material thereon." (*Id.* at 9 3:23–26 (emphasis added).) This outwardly extension (or protrusion) of the tray is not simply an extension of any part of the tray in any direction outside the receptacle's opening. Rather, the specification emphasizes that "the invention" is advantageous because of the specific way the tray can extend:

> An advantage of ***the invention*** resides in the manner in which the pivotal disposing means, for example a tray, can be presented for use in an open condition of the container. Advantageously, ***a forward portion of the tray extends beyond a front wall or surface of the receptacle*** and preferably also beyond the lid of the container. This ***protrusion of the tray beyond the receptacle*** and lid is such as to facilitate placement of a sharps object thereon without hindrance from the receptacle or lid.

(*Id* at 10 5:5–13 (emphasis added).) *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (finding disavowal of "short seals that do not extend inwardly" where the specification stated that "prior art bags are difficult to secure over trash receptacle lips" and explained that "the use of extended short seals reduces the claimed bag's upper opening, making it easy to fit around a trashcan"). The specification also states that the preferred embodiment is advantageous, in part, because the tray "extends slightly forward of a front edge [] of rim [] (that is, it protrudes outwardly of the receptacle)."[4] (JA at 11 8:28–30.)

Unsurprisingly, several claims of the '465 patent contain limitations relating to this particular tray feature. For example, claim 6 contains the following limitation: "the tray in its rest position protrudes outwardly beyond the receptacle to facilitate placement of medical sharps and waste materials thereon." (*Id.* at 14 14:62–64.) Similarly, claim 16 states that "at the rest position for the tray, a portion thereof protrudes outwardly beyond the receptacle to facilitate placement of medical sharps and waste materials thereon." (*Id.* at 15 15:45–48.) Finally, claims 21 and 22 use similar language, "the tray being arranged to extend outwardly from the opening" and "the mounting for the tray is arranged to cause it to extend outwardly from the opening in the receptacle," with the opening being at the top of a receptacle. (*Id.* at 15 15:67–16:18.)

The specification also describes the tray's outwardly extension as not necessarily entailing protrusion beyond the front wall or surface of the receptacle in all of its rotational positions—instead, it appears that protrusion beyond the front wall of the receptacle is a characteristic of at least one of the tray's positions (for example, a rest position). In other words, when the specification describes the tray as extending outwardly, it does not suggest that the tray must

---

[4] While the patent specification provides that the "rim" is a part of the open top end of the receptacle, the specification also distinguishes the "rim" from the "front wall" of the receptacle and depicts the "rim" as protruding beyond the front wall in various figures. (*Id.* at 2 fig. 1 (depicting a container with the rim and the front wall), 10 6:62–64 (describing the front wall of the receptacle and the rim).)

extend beyond the receptacle's front wall or surface at every point of the tray's pivoting movement. For example, the specification provides:

> [I]n this embodiment the pivotal disposing means is a tray, which may be biased to a rest position, may be foldable, may slope inwardly of the receptacle and which, ***in its rest position, may extend beyond the receptacle***, as is described hereinabove in relation to other embodiments of the invention.

(*Id.* at 10 5:38–43 (emphasis added); *see also id.* at 9 3:23–26 ("the pivotal disposing means, whether or not in the form of a tray, extends outwardly of the container when at its rest position").) Figures 4 and 5 depict the extension of the tray beyond the receptacle wall reduced as the tray pivots. (*Id.* at 5.) And Figure 9 depicts an embodiment with the tray in such a pivoting position that it protrudes beyond the front wall of the receptacle but not beyond the rim of the receptacle. (*Id.* at 4.)

The language of the '465 patent claims is also in accord with such an interpretation. For example, claim 22 states that "the tray is arranged to cause it to extend outwardly from the opening in the receptacle when the lid is in its opened position, and to be fully retracted into the container when the lid is in its closed position"—suggesting that the tray might not extend beyond the front wall or surface of the receptacle in all of its pivotal positions when the lid is open, as the tray has to completely retract into the container by the time the lid is closed. (*Id.* at 15 16:16–20.) Other claims recite limitations entailing outwardly extension of the tray specifically when the tray is in its rest position—thus signifying that the tray might not extend beyond the front wall or surface of the receptacle in its other pivotal positions. (*Id.* at 14 14:61–63 ("a portion of the tray in its rest position protrudes outwardly beyond the receptacle"); *id.* at 15 15:45–47 ("at the rest position for the tray, a portion thereof protrudes outwardly beyond the receptacle"); *id.* at 16 18:17–19 ("a portion of the tray in its rest position protrudes outwardly beyond the receptacle").)

17

Therefore, read in light of the specification and claims, the Court concludes that the term "to extend outwardly from the opening" means "to be in a position so that at least some part of the tray protrudes beyond the opening and so that, at least in one of the tray's pivoting positions, the tray protrudes forward of a front wall or surface of the receptacle." This construction differs from Stericycle's proposed definition—*i.e.*, "the tray has a resting position that extends substantially beyond the front edge of the receptacle's front wall"—in several ways.

First, the Court's construction does not incorporate a limitation that the tray have "a resting position." Such a limitation is simply absent from the language of claims 21 and 22, and nothing in the specification or other claims suggests that such a limitation must be read into the claims. (*Compare id.* at 14 14:15–34 (independent claim 1, containing no limitation that a pivotal disposing member has to have a rest position), *with id.* at 14 14:35–39 (dependent claim 2, containing such limitation (among other limitations).)

Second, the Stericycle definition mandates that the tray extend beyond "the front edge of the receptacle's front wall," not just the "front wall or surface" of the receptacle. It is unclear whether Stericycle is simply trying to account in its definition for the front wall's thickness or to limit the meaning of the term "extend outwardly" only to extensions beyond the rim in the front of the receptacle. Regardless, Stericycle's definition finds no support in the intrinsic evidence.

Third, the Court's construction of the term "to extend outwardly from the opening" does not require the tray to extend "substantially." Stericycle's argues that the invention is advantageous because the tray can extend beyond "a front wall or surface of the receptacle" so that "[t]his protrusion of the tray beyond the receptacle . . . is such as to facilitate placement of a sharps object thereon without hindrance from the receptacle or lid." (*Id.* at 10 5:5–13.) Therefore,

according to Stericycle, the tray must extend "substantially." As described above, however, this construction finds no support in the specification.

Stericycle also argues that the prosecution history of the '465 patent mandates that the extension be substantial because the patent owner allegedly relied on the term "extend outwardly" to overcome potential rejection of the claims based on U.S. Patent No. 5,947,285 ("Gaba patent"). The Gaba patent describes a medical waste disposal container. (*Id.* at 373–421.) In the course of prosecution, the Patent Examiner rejected what are now claims 21 and 22 of the '465 patent as anticipated by the Gaba patent, stating that "[a] lid [] and an operatively associated pivotal disposing means [] is disclosed in as much as is claimed." (*Id.* at 358 ¶6). In response, the applicant argued that the claims "specifically define the tray as being arranged to extend outwardly from the opening when the lid is in the opened position, and arranged to prevent hand access into the receptacle for all positions of the tray about its pivotal axis" and that the prior art cited by the Examiner "does not disclose an arrangement wherein a pivotal tray disposed at the opening of the container extends outwardly therefrom when the lid is in the opened position." (*Id.* at 447.) Stericycle claims that, similar to the '465 patent's "receptacle" and "lid," the Gaba patent discloses a "disposal container" having an "opening" at the top and a "hinge[d]" "lid" that can be opened and closed. (Def.'s Op. Br. at 17, Dkt. No. 28.). And like the '465 patent's "tray," the Gaba patent discloses a "tumbler" "pivotally mounted" at the opening so that sharps and waste can be placed on it for disposal into the container; but the tumbler, like the '465 patent's "tray," "prevents access to the interior" of the container. (*Id.*) Stericycle also argues that Figures 11 and 22 of the Gaba patent show that "tumbler" as extending beyond the front edge of the "disposal container" when the lid is opened. (*Id.*)

The Court does not find that the patentee limited the scope of the claims by responding to the Examiner's rejection based on the Gaba patent. The patentee's response in no way states that the invention of the patent-in-suit entails a tray that extends "substantially"—it simply states that the prior art "does not disclose an arrangement wherein a pivotal tray disposed at the opening of the container extends outwardly therefrom when the lid is in the opened position." (*Id.* at 447.) This does not meet the "exacting" standard of the claim disavowal, requiring a "clear and unequivocal evidence that the claimed invention includes . . . a particular feature." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). There is no clear and unequivocal statement that the tray must extend "substantially."

Therefore, the Court construes the phrase "to extend outwardly from the opening" to mean "to be in a position so that at least some part of the tray protrudes beyond the opening and so that, at least in one of the tray's pivoting positions, the tray protrudes forward of a front wall or surface of the receptacle."

## IV.    "Operative Condition" and "Inoperative Condition"

The next terms in dispute are "operative condition" and "inoperative condition," which appear in claim 23 of the patent-in-suit. Plaintiffs argue that the term "operative condition" requires no construction and should be given its plain and ordinary meaning, while "inoperative condition" means "a condition of the tray where the tray is not accessible for medical sharps and other waste." Stericycle contends that the term "operative condition" means "an orientation of the tray in which sharps or other medical waste can be placed on the tray, without regard to the presence or absence of the lid," and "inoperative condition" means "an orientation of the tray in which sharps or other medical waste cannot be placed on the tray, without regard to the presence

or absence of the lid."[5] The only dispute between the parties is whether the presence or absence of the lid has any relation to whether the tray is in an operative or inoperative condition. Stericycle insists that it is the position of the tray, not the presence or absence of the lid, that determines whether the tray is in its "operative" or "inoperative" condition.

This issue may be readily resolved by looking at the claim 23 language:

> . . . the lid and the tray are operatively associated so that the movement of the lid from its closed to its opened position moves the tray from an inoperative condition to **an operative condition wherein the tray is accessible for medical sharps and waste materials to be placed thereon**.

(JA at 15 16: 28–34 (emphasis added).) The language is clear that, in the context of this claim, the position of the lid matters for whether the tray is in "operative" or "inoperative" condition—*i.e.*, opening the lid moves the tray from its "inoperative" to its "operative" condition. Further, the claim states that in the "operative condition" the tray "is accessible for medical sharps and waste materials to be placed thereon." The claim does not say that the accessibility of the tray for medical waste in its "operative condition" is determined by the tray only, "without regard to the presence or absence of the lid."

By comparing the language of the claim to Stericycle's proposed construction, it becomes apparent that what Stericycle asks this Court to do is to modify the language of the claim so that it reads that in the "operative position" the tray "is accessible for medical sharps and waste materials to be placed thereon, **without regard to the presence or absence of the lid**." To support such a deviation from the claim language, Stericycle offers the following intrinsic evidence. First, it points to claim 23 itself, which states that the movement from the "inoperative" to "operative condition" involves the movement of the tray itself. That is true, but it indicates nothing about whether the lid plays a role in the tray's accessibility for medical waste disposal when it is in the

---

[5] Stericycle adjusted its proposed construction for the terms in its reply brief. (*See* Def.'s Reply Br. at 15, Dkt. No. 30.)

"inoperative" or "operative condition." Second, Stericycle points to the specification that also provides that the tray must move from "inoperative" to "operative condition." (*See id.* at 13 12:60–64 ("[o]n opening the lid, . . . the tray [is moved] from its inoperative condition to an operative condition, and in its operative condition the tray [] moves to its normal rest position).) Again, the Court agrees with Stericycle that "inoperative" to "operative condition" refers to the condition of the tray—in particular, its accessibility for medical waste to be placed upon it. Just because this is a condition of the tray, however, does not mean other parts of the container play no role in the condition.

Stericycle also points to Figures 8 and 4 of the '465 patent. Stericycle argues that in Figure 8 the tray is upside down and thus not accessible to receive medical waste regardless of the lid. Stericycle also notes that in describing Figure 8, the specification states that the tray "can be fully retained in an ***inoperative condition*** within the container" when the container is closed. (*Id.* at 13 12:26–28.) On the other hand, in Figure 4, the tray is right-side up and thus accessible to medical waste regardless of the lid. (*Compare id.* at 4 fig. 8, *with id.* at 5 fig. 4.) The Court agrees that in these depictions, the presence (or absence) of the lid does not make a difference to whether the tray is accessible for medical waste. But the specification also provides that when the tray in Figure 4 continues to pivot upwards (to a position close to the one shown in Figure 5), the gap between the tray and the lid narrows. (*See id.* at 12 10:49–53.) At the same time, the lid can also rotate towards the tray, further narrowing the gap between the lid and the tray. (*See, e.g., id.* at 12 9:1–6.) Thus, it appears that the specification contemplates the possibility the tray and the lid might get so close as to make the tray inaccessible for waste. (*Cf., id.* at 12 10:49–53 (describing that when the gap between the lid and the tray narrows, a user might not be able to use a hand to access the receptacle).) In such a situation, the tray might still be in a position where, absent the

lid, medical waste could be placed on the tray (e.g., a position similar to the one in Figure 5 but where the lid pivoted closer to the tray to reduce the gap between the lid and the tray) but the presence of the lid would make the tray inaccessible. Moreover, the language of claim 23 is clear in that it does not contain a limitation that the lid plays no part in accessibility or inaccessibility of the tray.

The Court therefore agrees with Plaintiffs that when claim 23 describes "an operative condition wherein the tray is accessible for medical sharps and waste materials to be placed thereon" it means "an operative condition wherein the tray is accessible for medical sharps and waste materials to be placed thereon," not "an operative condition wherein the tray is accessible for medical sharps and waste materials to be placed thereon, ***without regard to the presence of absence of the lid***," as Stericycle purports. The term "operative condition" is defined in claim 23 in a clear and easily understood manner and requires no further construction. *See ActiveVideo*, 694 F.3d at 1326 (holding that the district court did not err in concluding that terms had plain meanings that did not require construction and in rejecting one party's proposed construction, which erroneously read limitations into the claims). The Court construes the term "inoperative condition" as a "condition of the tray wherein the tray is inaccessible for medical sharps and waste materials to be placed thereon."

## V.    "Movable Lid" and "A Lid . . . Movable"

The meaning of the terms "movable lid" and "a lid . . . movable," which can be found in claims 21 and 23, is also in dispute. Plaintiffs argue that no construction is necessary and that the terms should be given their ordinary meaning. Stericycle contends that the Court should construe these two terms as one term defined as "a lid that moves between open and closed positions and cannot be locked into position." Notably, Stericycle agrees with Plaintiffs that the terms do not

require construction, yet Stericycle insists on construing the terms because of the arguments Plaintiffs raised in their validity contentions. (Def.'s Reply at 18, Dkt. No. 30.)

The Court agrees with the parties that the terms are easily understood by a lay person and require no construction.[6] Stericycle's proposed construction finds no support in the intrinsic evidence. Neither the claims nor the '465 patent specification and its prosecution history provide any hint that the "movable lid" "cannot be locked into position." On the contrary, the specification recites a preferred embodiment that "contains locking means for locking the lid" and even specifies that such locking means could be in the form of "a sliding lock arrangement." (JA at 13 11:9–12.) Thus, apart from having no support in the intrinsic evidence, Stericycle's proposed construction would read the preferred embodiment out of the claim's scope. *See Vitronics*, 90 F.3d at 1583 (stating that an interpretation that excludes a preferred embodiment from the claims' scope "is rarely, if ever, correct and would require highly persuasive evidentiary support").

In their final validity contentions, Plaintiffs argue that various prior art references do not disclose a "moveable lid" for movement between opened and closed positions because the "lid" disclosed in the prior art can be "lock[ed] . . . into place" in "the closed position," "such that movement between the closed and the open position is not possible." (Supplemental Appendix ("SA") at 17, 21, Dkt. No. 28-2.) According to Stericycle, "Plaintiffs' argument thus is necessarily premised on the claim language being interpreted such that the claimed 'moveable lid' 'moveable between opened and closed positions' ***cannot*** be locked in a closed position." (Def.'s Opening Br. at 25, Dkt. No. 28 (emphasis in the original).) Stericycle brought this issue to Plaintiffs' attention, but Plaintiffs refused to remedy the situation. Thus, Stericycle insists that

---

[6] The Court also notes that it is readily apparent why the patentee chose to use the term "a movable lid" in claim 21 while using the term "a lid . . . movable" in claim 23, without assigning different meanings— unlike claim 21, claim 23 specifies that a lid is "manually" movable. (JA at 15 16:25.)

"[i]f Plaintiffs do not unambiguously waive their purported distinction of the prior art on this ground, then the claim construction mandated by their position must be imposed, and Stericycle's device found noninfringing." (*Id.*)

Stericycle does not cite any caselaw for the proposition that statements made in the patentee's final validity contentions should limit the scope of the claims that the Court is construing. And the Court is not aware of any such authority. Stericycle's argument somewhat resembles a doctrine of judicial estoppel,[7] under which a party assuming and succeeding in maintaining a certain position in a legal proceeding, "may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). There are several factors that inform the decision on whether to apply the doctrine in a particular case—none of which are present here.[8] And the Court does not see any other reason to impose judicial estoppel at the claim construction stage of the case.

Invalidity analysis based on anticipation or obviousness in view of prior art references begins with claim construction—the Court must ascertain the meaning of the terms to ascertain

---

[7] The statements that Stericycle cites in support of its construction were not made by Plaintiffs in front of the Patent and Trademark Office. Hence, it appears that Stericycle does not argue that that Plaintiffs' statements give rise to a prosecution disclaimer. *See Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017) ("An applicant's statements to the PTO characterizing its invention may give rise to prosecution disclaimer. . . . Prosecution disclaimer can arise from both claim amendments and arguments made to the PTO.").

[8] First, "a party's later position must be 'clearly inconsistent' with its earlier position." *New Hampshire,* 532 U.S. at 750. Second, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" *Id.* But "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' . . . and thus poses little threat to judicial integrity." *Id.* at 750–51. Third, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped" is also an important consideration. *Id.* at 751.

the claims' scope. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Thus, a claim must be construed before determining its validity. *Id.* Before the Court's construction of the terms is known to the parties, they cannot possibly anticipate which construction the Court will adopt and, consequently, which arguments regarding infringement or invalidity are the best in view of the claims' scope. To accommodate such uncertainty, parties might choose to make arguments regarding a patent's validity prior to claim construction that they might want to change after the Court construes the claims. In fact, Local Patent Rule 3.4 specifically contemplates that, while a party may amend its final infringement or non-infringement and invalidity contentions only by order of the Court upon a showing of a good cause and absence of unfair prejudice to opposing parties, "[a]n example of a circumstance that may support a finding of good cause, absent undue prejudice to the non-moving party, includes a claim construction by the Court different from that proposed by the party seeking amendment." Thus, an alleged infringer might make an invalidity argument prior to claim construction that lacks merit once the Court's construction is known or might have a better invalidity argument once the construction is known. Accordingly, an alleged infringer might ask to amend its invalidity contentions once the construction is revealed. The patentee is in an even more uncertain situation—not only might the Court's claim construction change the patentees' best arguments against invalidity, but the alleged infringer might also adjust its invalidity arguments, thus necessitating a change in the patentee's strategy.

Whether or not Plaintiffs may amend their final validity contentions in the future is not a matter currently before the Court. And the Court sees no reason why arguments made by Plaintiffs in their final validity contentions should impact the claim construction that is presently

in front of this Court. Thus, the Court concludes that the terms "movable lid" and "a lid . . . movable" do not require construction because their ordinary meaning is readily apparent.

## VI. Preambles of Claims 21 and 23

The parties agree that the preambles of claims 21 and 23 require no construction. Yet Stericycle insists that there is still an issue for the Court to resolve here because Plaintiffs allegedly advanced a position in their final validity contentions suggesting that the preamble phrases act as claim limitations—that is, Plaintiffs stated that certain prior art references are distinguishable from claims of the patent-in-suit because they do not disclose containers or receptacles for storing "mail" or "tools" rather than medical sharps and waste. (SA at 12, 14, 17, 21, 25, 27, 31, 33, 36, 39, 42, 45, 48.)

Whether a preamble is limiting must be determined upon review of the entire patent "to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). There is no simple test to determine when a preamble limits the claim scope, but certain "guideposts" are available. Generally, the preamble does not limit the claims. *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017). But the preamble may be limiting if it recites essential structure or steps, if claims depend on a particular disputed preamble term for antecedent basis, if the preamble is essential to understanding the limitations or terms in the claim body, if the preamble recites additional structure or steps that are highlighted as important by the specification, or if the patentee clearly relied on the preamble during prosecution to distinguish the claimed invention from the prior art. *See id.*

The reverse is also true—a preamble does not limit the claim where the claim body defines a structurally complete invention and where the preamble only states a purpose or intended use for the invention. *See id.* Without reliance on the preamble during prosecution history to distinguish

the invention, "a preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 809. In other words, a preamble that merely "extol[s] benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant." *Id.*

Here, there is no indication that Plaintiffs relied on the preamble of claim 21, "[a] container for storing medical sharps and waste materials," to distinguish the invention from the prior art during the prosecution history. There is no indication that the preamble recites essential structure or steps; there are no terms in the body of the claims that depend on a preamble term for antecedent basis. The preamble is not essential to understanding the claim body and does not recite additional structures or steps that the specification deems important—in fact, deleting the preamble would not affect the structure of the claimed invention. The preamble is an easily understood phrase. And as discussed above for the terms "movable lid" and "a lid . . . movable," Stericycle's arguments about imposing limitations on the claim scope due to Plaintiff's arguments in their final validity contentions are without merit. Therefore, the preamble of claim 21 requires no construction and is not limiting.

Unlike claim 21, which begins with the phrase "[a] ***container for storing*** medical sharps and waste materials," claim 23 starts with "[a] container comprising ***a receptacle for receiving and storing*** medical sharps and waste." (JA at 15 15:65–66, 16:21–23 (emphasis added).) It appears that the phrase "for storing medical sharps and waste materials" in claim 21 refers to a "container," the word immediately preceding the phrase. In contrast, the phrase "for receiving and storing medical sharps and waste" in claim 23 appears to refer to the immediately preceding word "receptacle." The parties ask this Court to ignore the clear difference in the claims' language and

to construe claim 23 as including the preamble "a container . . . for receiving and storing medical sharps and waste." The Court sees no reason to do so. While the word "comprising" might not be a general bright-line guidepost for where the preamble ends, *see, e.g., PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp.*, No. 16-CV-01266-EJD, 2017 WL 2180980, at *12 (N.D. Cal. May 18, 2017) (discussing the issue of what delineates the preamble under the Federal Circuit law), here, it appears to separate the preamble from the body of the claim, which contains structural elements. Apart from the clear difference between the language of claim 21 and claim 23,[9] the specification highlights that when the patentee desired to state that it is the container that is for "receiving and storing medical sharps," and not a "receptacle," the patentee knew how to do it. Thus, an abstract of the '465 patent states: "[a] sharps ***container for receiving and storing*** medical sharps and waste materials which prevents hand access to within the container and has a wide access opening." (JA at 1 abstract.)

Therefore, the preamble of claim 23 is "a container." And the Court agrees with the parties that the preamble requires no construction and is not limiting. Other than Stericycle's argument regarding Plaintiffs' statements in the final validity contentions, which the Court rejects for the same reasons as articulated above for claim 21, the parties have not presented any arguments regarding the meaning of the phrase "for receiving and storing medical sharps and waste" in claim 23. Thus, it appears they agree as to what the phrase means and the Court will not construe the meaning of the term at this stage.

---

[9] The Court also notes that much like claim 23, claims 1, 26, and 28–30 all contain the phrase "a container comprising a receptacle for receiving and storing medical sharps and waste" at their beginning.

## CONCLUSION

For the reasons stated above, the Court construes the disputed terms as follows:

| Disputed Term(s) | Construction |
|---|---|
| "Hinged" and "hingedly connected" | "Connected by a mechanism that allows for a pivoting movement" |
| "Prevent hand access into the receptacle" and "impede hand access into the receptacle" | "Make it so that a person who is using the container, as well as others who may come into contact with the container, cannot extend their hand(s), or portion of their hand(s), into the receptacle that holds medical sharps and waste, thereby substantially eliminating injury or infectious transmission by preventing human contact with medical sharps and waste" |
| "To extend outwardly from the opening" | "To be in a position so that at least some part of the tray protrudes beyond the opening and so that, at least in one of the tray's pivoting positions, the tray protrudes forward of a front wall or surface of the receptacle" |
| "Operative condition" | No construction is necessary |
| "Inoperative condition" | "Condition of the tray wherein the tray is inaccessible for medical sharps and waste materials to be placed thereon" |
| "Movable lid" and "a lid . . . movable" | No construction is necessary |
| Claim 21 preamble, "[a] container for storing medical sharps and waste materials" | No construction is necessary |
| Claim 23 preamble, "[a] container" | No construction is necessary |

ENTERED:

Dated: December 18, 2018

_____
Andrea R. Wood
United States District Judge